# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 7, 2013 Session

## GERALD SANFORD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 04-05865     Paula Skahan, Judge**

---

**No. W2012-01194-CCA-R3-PC  - Filed June 7, 2013**

---

The petitioner, Gerald Sanford, appeals the denial of his petition for post-conviction relief, arguing that his trial counsel provided ineffective assistance by not hiring DNA and blood spatter experts to testify at his trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Marvin Adams, III (on appeal) and Melody Oliver (at hearing), Memphis, Tennessee, for the appellant, Gerald Sanford.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Brooks Irvine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In December 2006, the petitioner was convicted by a Shelby County Criminal Court jury of the first degree premeditated murder of his girlfriend and sentenced to life imprisonment.  His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal.  State v. Gerald Sanford, No. W2007-00664-CCA-R3-CD, 2008 WL 3066828, at *1 (Tenn. Crim. App. Aug. 1, 2008), perm. app. denied (Tenn. Jan. 20, 2009).  Our direct appeal provides the following summary of the evidence presented at trial:

At the trial, John Sutphin testified he was a security officer for Federal Express. On May 30, 2004, he was dispatched to an area off Business Park Drive. When he first arrived, he observed the [petitioner] getting out of a Chevrolet Blazer with a flat front left tire. Officer Sutphin testified that the [petitioner] was naked from the waist down, "had blood all over him," appeared scared and nervous, and asked the officer to "help his baby." After checking on the victim, Kelly Alexander, Officer Sutphin noticed that the victim was on the ground and holding a tire iron. Upon closer inspection he noticed that "[s]he was covered in blood. . . . I observed a severe gash over her right eye. There was no movement of the chest as in breathing. Her eyes looked to be fixed, that of death." Officer Sutphin then immediately called for backup.

Officer Sutphin testified that the [petitioner] told him that he was approached by two unidentified men right after he and the victim finished having oral sex. The [petitioner] claimed the unknown men attacked him and the victim, but he could not provide a description of the attackers.

Several officers testified about what they discovered and did when they arrived on the scene. Soon after the police arrived, they handcuffed the [petitioner] and placed him in a police patrol car when he became emotional and "out of control." The [petitioner] complained of injuries to his right hand as well as his feet. He continued telling officers that he and the victim were attacked by two unidentified assailants. The [petitioner] explained that the victim picked him up and drove them to this remote location because she had a restraining order filed against him and they were not supposed to be together.

An investigation of the crime scene revealed several trails of blood, shattered auto glass, and an open-toed sandal in the grass. One blood trail led to the broken glass, another led from the victim, and yet another led to a nearby dumpster. The officers found blood on and around the dumpster. Inside the dumpster, the officers found a right shoe, a "flip flop" or shower shoe, red shorts, and some plastic bags.

Donna Nelson, a forensic scientist assigned to the serology and deoxyribonucleic acid (DNA) unit of the Tennessee Bureau of Investigation (TBI), testified that she examined vaginal, rectal, and oral swabs from the victim to look for the presence of sexual activity. The vaginal swab revealed the presence of semen, but she found no DNA profile other than that of the victim. The rectal and oral swabs tested negative for semen.

Ms. Nelson next examined a blood standard from the victim, as well as samples from the victim's right-hand fingernails. The fingernail scrapings indicated the presence of blood and human DNA, with the major contributor matching the victim and the minor contributor of the profile matching the [petitioner]. Swabs from the front grill of the vehicle, the outside windshield, and the hood of the driver's side door indicated blood from the victim. A swab from the inside rearview mirror was a partial match with the [petitioner]. Swabs from blood found on the steering wheel, the top of the left seat, driver's door arm rest, right rear seat, outside of the rear right door, left rear seat, and left rear door matched the [petitioner]. Blood found on the left shower shoe indicated the presence of a mixture of blood DNA, with the [petitioner] being the major contributor and the victim being the minor contributor. Blood found on the tire iron indicated the presence of a mixture of blood DNA, with the victim being the major contributor and no determination possible for the minor contributor. Blood DNA found on the pair of shoes, the victim's cell phone, and the victim's car keys matched that of the [petitioner]. Blood DNA found on a tissue and the victim's purse matched that of the victim. Fifteen swabs were taken from the parking lot and dumpster area, with eight of them indicating a complete match to the [petitioner's] DNA, six of them containing partial DNA profiles matching the [petitioner's] profile, and the final swab containing a mix of DNA where the [petitioner] was the major contributor and no determination could be made for the minor profile.

The [petitioner] was later formally questioned by the homicide bureau of the Memphis Police Department. At this point in the investigation he waived his rights and gave a statement that contrasted with what he had told officers at the crime scene. The [petitioner] admitted responsibility for the victim's death, telling officers, "I hit her." His statement described the events of the evening as follows:

> She came to my house about two thirty a.m. this morning and picked me up and said she wanted to go somewhere and talk. . . . We went behind FedEx and she told me that she was aware of all the women I was sleeping with and she was tired of it. She told me she was pregnant and that she wanted a relationship with me. She wanted to marry me and raise our two kids together. I told her that was not what I really wanted. That made her angry. She said she had devoted five years to this relationship and we were going to be together. I told her, no, we were not. We had words and she pulled [a] knife out on me and

-3-

said if she couldn't have me, no one could. I panicked and hit her. After I hit her, she swung the knife at me and stabbed me. That's what cut my right hand. I got stitches. I hit her again. This time I hit her too hard and I really hurt her. I panicked again and hurt her. She tried to drive off after I realized I had hit her a second time and really hurt her. I jumped back in the car. That's how my legs and stuff got scarred up. She was going fast and lost control of the car and hit the curb and wrecked. It messed her face up. I got out and pulled her out of the truck to see if she was okay. She told me she was dying and I panicked. I hit her with the stick that she had in the car. My shorts came off me because they were real loose when I was trying to get back in the car and she drove off. I was going to walk off and leave the scene but my heart wouldn't let me. I walked back to her truck and called 9-1-1 and that was it.

The [petitioner] admitted to the police that his original story to the police about being the victim of an attack was a lie that he made up because he was scared. No knife was ever recovered at the scene of the crime.

Thomas Deering, interim chief medical examiner for Shelby County, testified that he performed the autopsy on the victim. He stated that the victim had multiple lacerations from blunt trauma injuries, which are "blows either of such force that the skin is tearing or the blows are – the force is being focused on a fairly narrow surface so that as it hits the skin, it's tearing the skin." The lacerations were consistent with being hit with a tire iron. [Dr.] Deering determined that the victim received 20 separate blows to the head excluding the mouth, all of which were suffered while the victim was still alive. The victim's cheekbone and nose were broken, she was missing a tooth, and she had a black eye. The victim had lacerations and abrasions on her neck consistent with a tire iron. [Dr.] Deering testified that in his opinion, the cause of death was due to multiple blunt trauma injuries inflicted to the head and the neck.

The [petitioner] chose not to testify.

Id. at *1-3.

On November 5, 2009, the petitioner filed a *pro se* petition for post-conviction in which he raised a claim of ineffective assistance of trial and appellate counsel. Although the

-4-

petitioner alleged a number of instances of ineffective assistance in his petition and at the evidentiary hearing, he confines himself on appeal to arguing that trial counsel was ineffective for failing to secure a DNA and a blood spatter expert at his trial. Accordingly, we will summarize only those portions of the evidentiary hearing testimony that are relevant to those allegations.

At the February 3, 2012 evidentiary hearing, the petitioner complained that his trial counsel only discussed the case with him twice over the course of three years. He said that he asked counsel several times if he understood DNA evidence and that counsel replied that he was "getting around to it." According to the petitioner, when counsel was later asked during the suppression hearing if he wanted to bring in a DNA expert, he said that he "was not, absolutely not, doing it" because he had known of another lawyer who had "done the same thing" and had been "swamped in paperwork" that he did not understand and that wasted a lot of his time.

The petitioner testified that a DNA expert would have helped his case because none of the victim's blood was found on him and none of his blood was found on the murder weapon, a tire iron, despite the fact that he was bleeding from a cut on his hand. In a similar vein, he believed that a blood spatter expert would have helped his case because the victim's having been beaten with a tire iron would have produced blood spatter, and yet none of the victim's blood was on him.

The petitioner's trial counsel, who had been licensed for twenty-six to twenty-seven years and practicing criminal law for seventeen or eighteen years, testified that he met with the petitioner "quite often" during the time he represented him. He adamantly denied that he told the petitioner that he did not want to hire a DNA expert because of the paperwork involved. He said he instead explained to the petitioner that he was requesting funds for a DNA expert to analyze the testing that had been performed by the State and that his co-counsel would be responsible for handling that aspect of the case, including the cross-examination of the State's expert. Trial counsel testified that they received permission for funding for a DNA expert but did not end up using one. He explained that the company he contacted wanted access to the State's expert's computer hard drive in order to conduct their analysis, but the State refused to grant it and the trial court denied their motion to order the State to do so. He said the trial court ruled that their defense experts could "go out there to [the State's] plant and do it" but that the experts he had contacted did not want to do that, given the fact that they were so close to trial. Trial counsel further explained that he and his co-counsel had cross-examined DNA experts before and that he did not, therefore, believe that it was necessary for them to employ their own DNA expert in order to conduct an effective cross-examination of the State's expert.

Trial counsel testified that he could not recall having ever talked with the petitioner about employing a blood spatter expert. Regardless, he did not see how it would have helped the petitioner's case:

> Well, I don't know how an expert could have helped us. I mean, there was blood everywhere. There was no blood on him. I'm not sure I, you know, you can say – in fact, we did argue. Those were the things we argued, was that there was no blood on him, they didn't – nothing on the murder weapon, and all of those things. We did challenge that. I don't think we needed an expert to tell us that there was no blood on him.

Co-counsel, who had been practicing criminal defense law for twenty-two years, testified that he had had experience cross-examining DNA experts in prior cases and therefore volunteered to help counsel on the petitioner's case. In preparation, he reviewed "a bunch of articles" and read some books on the cross-examination of DNA experts. He said there are essentially three areas of cross-examination: (1) the certification of the laboratories and personnel that performed the testing; (2) the contamination of the samples; and (3) how the laboratory that performed the testing arrived at its database. Co-counsel stated that he met with the petitioner at least once, and possibly twice, in the jail. He was confident that he discussed the DNA evidence with the petitioner and that he let him know that he would be handling the DNA aspects of the case. On cross-examination, he testified that the only reason he could see for consulting a DNA expert would have been if they were challenging how the Tennessee Bureau of Investigation arrived at its database.

On May 31, 2012, the post-conviction court entered an order denying the petition, finding, among other things, that trial counsel's decision not to call a DNA or blood spatter expert to testify at trial was a sound, strategic choice. This appeal followed.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness

given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In support of his contention that trial counsel was ineffective for not employing a DNA expert, the petitioner cites counsel's "Motion for Funds for Expert Assistance" in which he stated that "several problems" were "apparent" in the State's DNA analysis, which

"call into question the validity and scope of the [State's] DNA testing." According to the petitioner, such a motion "directly contradicts trial counsel's assertion at the post-conviction hearing that he 'wasn't sure [a DNA expert] would have helped'" the case. The petitioner also argues that a blood spatter expert would have raised reasonable doubt for the jury because a blood spatter expert's findings would have corroborated the petitioner's version of events, which was that he had fled from the men who attacked and killed the victim.

The post-conviction court made the following findings of fact and conclusions of law in denying relief on the basis of the petitioner's claim that counsel provided ineffective assistance by not calling a defense DNA expert at his trial:

> [Trial counsel] testified that he did indeed seek, and was awarded, funding for the DNA expert. [Trial counsel] did not call the expert because of time restrictions, and did not feel that the expert was necessary strategically. According to [trial counsel], a DNA expert called by the defense would have only been able to testify to the veracity of the State's DNA expert's findings. Because the State's DNA expert found no blood on Petitioner, nor was his blood on the murder weapon, there was nothing for a defense expert to add to their conclusion. Thus, Petitioner has failed to show that counsel's failure to call this expert rises to the legal level of what is considered ineffective.

The post-conviction made similar findings and conclusions with respect to counsel's failure to call a blood spatter expert:

> Additionally, [trial counsel] did not feel it was tactically or strategically necessary to call a blood-spatter analysis expert. Because this Court refrains from second-guessing the tactical and strategical decisions of trial counsel, and because Petitioner did not show how the outcome would have been different had the blood-spatter expert been called, Petitioner has failed to show that counsel was deficient on this point.

The record fully supports the findings and conclusions of the post-conviction court. Because there was no dispute that the victim's blood was not found on the petitioner and the petitioner's blood was not found on the tire iron, there was nothing that a defense DNA expert could have added to the case. The fact that counsel, in his motion for funding for an expert witness, may have stated that there were "several problems" that were "apparent" in the State's DNA analysis of the evidence does not mean that his later decision not to employ a DNA expert to testify at trial was not a sound, strategic one based on his research and preparation for the case. Similarly, the petitioner cannot show that counsel's failure to employ a blood spatter expert, who would have added nothing to the defense beyond the

evidence already presented by the State, was not a sound, strategic decision on the part of counsel. The petitioner has not, therefore, met his burden of showing that counsel was deficient for failing to employ and call DNA and blood spatter experts or that he was prejudiced as a result of counsel's failure to do so.

## **CONCLUSION**

Based on our review, we conclude that the petitioner has failed to show either a deficiency in counsel's performance or resulting prejudice to his case. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____

ALAN E. GLENN, JUDGE